Council for the appellate, would you make your appearance and proceed please? May it please the court. Good morning, your honors. My name is Edesha Maria. I am a 3L at the University of Denver, and I represent the petitioner, Mr. Awuku-Asare. My supervising attorney, Tommy Lodez, is also on the Supreme Court. I am a 3L, and I represent the petitioner, I'd like to reserve three minutes for rebuttals. Today, your honors, I have one central question before you. Is it just for the government to remove someone under this removal statute for failing to maintain status when the failure to maintain status was not the fault of a non-citizen? Now the answer to that question is no. First and foremost, because the plain statutory scheme, third, because the agency's own regulations, and fourth, because the canons of statutory construction all lead to this conclusion. Proper application of the appropriate legal standard requires that the non-citizen himself must have failed to trigger deprecation under this statute. And considering the evidence in this case, that leads us to one reasonable conclusion. Mr. Awuku-Asare himself did not fail as required by the statute. And let's work through this, and let me start with the act of voice statement. A person can fail to do something, it doesn't say anything about the conditions that result in the failure. So I'm not sure why act of voice gets you as far as you suggest it does. I mean, the act of failing does not relate to or speak to the conditions that cause you to fail. And we're in the plain text of the statute, does it say that the conditions that cause you to fail have to be conditions of the petitioner? Certainly, Your Honor. I think we can look at the plain language of the statute to find that the failure must be on the part of a non-citizen. If you break the statute down, it has three relevant parts. An alien who was admitted and who has failed to maintain status is deportable. Now the way that the statute is framed necessarily puts the action on the part of the non-citizen for him to have failed. We know that is true, because Congress could have written the statute in a number of ways that would support the conclusion that somebody can fall out of status through no fault of their own. For example, Congress could have written the statute to say an alien who was admitted and who is determined to have failed to maintain status is a non-citizen and who DHS determines their status, or an alien who was admitted and who has had such status terminated. Now we see those framings used in other parts of the statute, but it's not in this statute. This statute necessarily requires that the who has failed to be the alien. Well, the statute could have also included, I'm sorry, was somebody speaking? The statute could have also included when it is not the alien's fault. I mean, the BIA specifically spoke to a number of provisions that have fault provisions associated with them to determine whether relief will be available. The silence here is deafening in this statute as it relates to such a provision. There is no such thing. Certainly, and just to clarify, I believe you're talking about 12.9 AB 5, which is the I was referring to, I think it's 12.5.5 is what the BIA referred to as one provision among others that had language in it that required some sort of activity that the alien would not be held responsible if it wasn't their fault. Yes, on page, I guess, page two of the decision, page three of the record, it speaks of 12.5.5 C in terms of adjustment of status. It speaks of other provisions of the CFR that turn on whether there was some impediment that to the alien proceeding forward, and the BIA makes the point, which seems pretty in the applicable statute. Your Honor, I think we could look at this court's decision in Lee v. McKasey. I couldn't wait to hear from Lee. Please go ahead. Yeah, so this court analyzed in Lee v. McKasey the statute that contained the relevant phrase, if the alien terminates or abandons their course of study. Now, the statute of issue in that case also did not have explicit provision that the fault was not attributable to the non-citizen, like the one that Your Honor mentions here, but the court still focused on the plain language of the words in the statute and specifically focused on the ordinary meaning of the words used. Now there, the court held that by the ordinary meaning, terminate and abandon required that the alien be the one to act, not be acted upon to violate the statute. Sorry, doesn't that undercut your argument, the Lee case? I mean, it focused on the meaning of the words terminate and abandon and what that means. We don't have words like terminate or abandon here. We have the word failure to do something. A failure to act, basically, can be sufficient. We don't have those kinds of affirmative concepts here. I guess I'm struggling to see how Lee really helps you much. Certainly, Your Honor. I would argue that though we don't have the explicit terminate or abandon words in the statute, that failure can be argued that it is synonymous with those words. If you look at the record in this case, whenever at the immigration court hearing, the immigration judge asked Mr. Wugosari, would you agree with the United States that your status here has been terminated? He explicitly used the word terminate in the proceedings and Mr. Wugosari agreed to that passive voicing of whether his status had been terminated. So while we are analyzing different words in the statute, I do believe that Lee is highly helpful to this court in regards to this case because it still supports the conclusion that Congress intended deportation only for non-citizens who act to follow up status. What can also be supported by the statutory scheme of the issue is the decision in matter of Ebro where a non-citizen was already removed in absentia while he was incarcerated and the board found that he was not at fault for failing to appear in his proceedings because of his incarceration and that is because incarceration on a criminal charge does not imply that the non-citizen is at fault. And there was statutory language in that effect, was there not? Certainly not. There was that statutory language. And that's why it's not clear to me why matter of Ebro helps you because there is no such language here. I believe that Ebro is helpful in the overall statutory scheme to show that Congress intended deportation only for non-citizens who act to follow up status. Again, the statute of the court analyzed in Lee did not contain that explicit provision either, but the court still focused on the plain language of the words, the ordinary meaning of the words used and found that despite not having that provision that creates an exception for failure, the court still found the non-citizen must be the one to act, not be acted upon to violate the statute of status. And further, Your Honor, in Lee v. McKinsey, the respondent was actually applying for adjustment of status. And it was her burden to prove that she was admissible for adjustment of status. In these proceedings, the court should focus on the burden of proof, which is the government's burden of proof to prove by clear and convincing evidence that Mr. Wugulsari failed as required by the statute. Let me ask you a factual question, if I may. What status was the petitioner in at the time that he was incarcerated? Was he still, had he still maintained his F-1 status at that juncture? Your Honor, to answer that question, I think the record is actually unclear whether he was in status or out of status. What we do know from the record is that his status was automatically terminated on February 9th, 2018. Now, there is no indication in the record whether he was maintaining status or whether he had fell out of status before that. The fact that we do know from the record is that the department's sentence system automatically terminated his status on February 9th, 2018. And the termination of that status was what Mr. Wugulsari was charged with in his notice to appear. They were explicitly charging him with, your status was terminated on February 9th, 2018. So that, I would argue to the court that that's the termination of status that we should focus on, and that is what is clear from the record. Well, let me ask you this, was there any attempt by the petitioner to seek to be reinstated after he was incarcerated? Why would that not have been something that he could have done via Rima Bible? Certainly, Your Honor. Mr. Wugulsari was incarcerated for 13 months from August 22nd, 2018 to his acquittal on September 12th, 2019. Now, during that time, it's, as a practical matter, Mr. Wugulsari may have been able to But it's sort of unclear how he would have been able to satisfy those requirements as, you know, there are a multitude of different requirements that a non-citizen has to satisfy in order for that to happen. And it's unclear whether Mr. Wugulsari would be able to attend the required amount of hours of in-person classes while he was incarcerated. On top of that, Mr. Wugulsari was exercising his constitutional right to a jury. He didn't know when he was going to be acquitted. So it's also unclear what semester he should have applied for Rima Bible for reinstatement. You know, ultimately, I think he was at the hands of the criminal justice system in Oklahoma awaiting his trial. And then, obviously, as we know from the record, once Mr. Wugulsari was acquitted of his charge, he was not released because of the ICE federal hold. He was detained for two more days until the notice to appear was issued on September 14, 2018. Mr. Shulman, may I ask you, because I just want to make sure I fully understand the whole issue of reinstatement and his loss of status. Tell me if I'm misunderstanding. So when his previous institution, I think it was for an R1 visa, was when they lost funding, or no, tax exempt status. So they, on February 9th, he becomes out of status. Not for five months yet, but let's say February 10th is day one. And then he goes through roughly August, and he's, as I understood the record, was that he was preparing his application for reinstatement of status. It's a little unclear to me whether he had been out of status for more than five months or whether he was just getting up to the window. But then in roughly August, when it's right about five months, then he gets arrested. And so what I had struggled with in studying for this case was, well, he obviously had been out of status for almost, if not the five months, prior to the time that he was incarcerated. But I guess your ultimate point, which I think you're arguing now, is it doesn't really matter whether he was out of status for more than five months because you still have the statutory interpretation issue in any event. Because he was ultimately deemed removable because he was out of status for more than five months. And the only issue is if he had not been arrested 13 months earlier, whether he would have been able to receive reinstatement. Obviously, it's a discretionary remedy that would probably be almost, I would assume, a very, very difficult undertaking to say 19 months later, I'm going to move for reinstatement. Is that essentially your argument? On the reinstatement part. Certainly, Your Honor. I see I am out of time because I would like to reserve the remaining time for follow-up. But if I may answer the question. Please do. Okay. I think your interpretation of our argument is correct, Your Honor. This case is not about whether Mr. Rieser was retaining his status. This case is not about whether Mr. Rieser applied for reinstatement. This case is about the statutory interpretation of the removal statute and whether by its plain language it required the non-citizen himself to have failed in order for him to violate his status.  Thank you. Yes, Counselor. Good morning, Your Honors. May it please the Court. Christopher Bates for the respondent. The petitioner in this case, Mr. Owuklusare, was admitted to the United States in F-1 status, but he failed to maintain that status in which he was admitted by failing to pursue a full course of studies. He was therefore removable as charged. His removability was supported by clear and convincing evidence and the substantial evidence supports the poor decision in this case, and therefore this Court should deny Mr. Owuklusare's petition for review. Petitioner's argument, as I understand it, essentially boils down to the argument that there is a fault or a beyond the non-citizen's control requirement in the statute. Such a requirement does not appear in the statute, nor does such a requirement appear in any of the implementing regulations either, and as we identify in our brief, there are provisions in the implementing regulations that do identify certain scenarios that may come into play depending on whether a certain situation is the fault of the non-citizen or whether a certain situation is the result of circumstances beyond the non-citizen's control, but those scenarios don't apply here. The petitioner also argues that there is a sort of affirmative act requirement in order for a non-citizen to fail to maintain status. As Your Honors were discussing with Mr. Chevarria, such a requirement does not appear in the text of the statute either, and the petitioner's citation to the Lee versus Mukasey case, I believe, is off point.  In that case, this court interpreted the text of the M-1 visa statute and found that the text there which said that a visa becomes void if the student terminates or abandons their studies at a school, that that requires an affirmative act on the part of the student. The language here is obviously quite different. It's not terminates or abandons. It's failure to maintain. That connotes a failure to do something. Well, I didn't see. I don't recall that argument being made in your brief. I understand that to be the argument that to be the statement, perhaps wisely so, that Judge Moritz made, but I don't recall you making that argument. And more to the point, in that case, it seems to me you do have the argument that that provision didn't have a fault. That statute didn't have a fault provision either, did it? That's correct, Your Honor. But the language that was used in that statute was more active. Terminate or abandon. What does that mean, more active? You know, grammar is grammar. You know, something is either in the active voice or it's not. I've never heard anybody say, and I don't mean to minimize it, because I think that's really an important point. Between the active verb failed and the active verb terminate or the active verb abandon, how do we write an opinion to say, well, terminate or abandon is more active of a verb than failed? Why do you say that? So I think it comes into play, Your Honor, with the term that's used is fail to maintain. So to terminate or to abandon, I think that connotes the idea that you are doing something to terminate, doing something to abandon. To fail to maintain means to not do something, to not take some action. And the implementing regulations set forth various requirements that are necessary to maintain status. First and foremost is maintaining a full course of studies, which is generally defined as 12 credit hours per semester. The implementing regulations contain certain exceptions for when a student may still be considered to be maintaining status, even though they aren't having 12 credit hours, for instance, during the annual vacation. If it's necessary for them to drop below a full course load because of medical reasons or because in their first semester they're having difficulties with English proficiency. So the regulations set forth certain scenarios where one may still be considered to be maintaining status, notwithstanding, you know, satisfying the general requirement of maintaining that full course load. And so I think the point, Your Honors, is something that to fail to maintain suggests a failure to do something. The regulations set forth what is required in order to maintain. And that that is a different situation from saying you have to, you know, terminate or you have to abandon. It's different language that results in a different outcome. Let me ask this. In your brief, there is a good bit of discussion about whether at the time the petitioner was arrested, he in fact had failed to maintain his status, and whether he was out of status at that time. The BIA seemed to take as the operative date, the date of that whatever that database indicated that he had failed to maintain status. And so it seems to me for purposes of our analysis and review of the BIA decision, isn't that the operative date that we're looking at? So Your Honor is correct that that's how the BIA phrased this decision. I believe the term it may have used was that's when the status was formally terminated, and that was a reference to the date when the notation was made in the CVS database. You know, as a matter of the statute and the regulations, and as I believe this court recognized in the Atandi or the Atandi case, the notation in the CVS database, the relevant date for determining whether status is maintained or not is not the notation of the CVS database. It's whether the student has continued to comply with the conditions that are necessary to maintain status. But that's not the question here, though. I'm talking about the review issue. I'm talking about the question of what the scope of review is. If we're reviewing the BIA's decision, and the BIA uses the CVS date as the termination date, this is the point. Could we issue a decision that said, well, you know, irrespective of this whole interpretation issue, we know as a matter of fact that he had failed to maintain his status by the time he was arrested. And as a consequence of that, if this whole interpretation issue is moot, because in fact the BIA is right, maybe not for the reasons it indicated, but it's right because he had failed to maintain his status. Now, is that consistent with our review standard for the BIA? I think that's a good question, Your Honor. So the BIA said in its decision that he was removable because he had, let me just turn to the text here, because he did not maintain his F-1 status, and his F-1 status was formally terminated by the DHS, which I take to be the date that Your Honor is referring to there. So the BIA did certainly suggest that the date of formal termination was the date of the notation in the CVS database. That's, you know, as a description of when status remains in effect or not, based on this court's decision in Otani and other cases we have cited in our brief from other circuits, that's not necessarily a correct understanding of the statute or the regulations. But even, you know, taking that date of the CVS notation as when his status was terminated, this court should still deny the petition for review because under this interpretive question, which Your Honors have been discussing today, there is no fault, there is no beyond the student's control requirement in the statute. So even if the, you know, date that Mr. Wukusare fell out of status was February 2018, the petition for review should still be denied. And that's the point I want to get at. Maybe as a matter of fact, that is not the date, but for purposes of how we look at this review and whether we need to, as the BIA seemed to, engage with the interpretive issue. In other words, BIA seemed to say, all right, fine. We'll take it that you were terminated on the, by the CVS termination date and that you could not, you were out of status because you were arrested. Even if I spot you those things, you still lose because of the interpretive question. It seems to me that is the scope of the question that we are faced with now. Would you disagree with that? I would not, your honor. I would say that, you know, as, as Mr. Savario indicated, the record is somewhat unclear as to whether Mr. Wukusare was in or out of status at the time that he was seeking to begin his enrollment or reinstatement at Rima Bible college. You know, he, he did in his brief for the board, he talked about his reinstatement enrollment package, which may tend to suggest that he understood that he was not in status at that point. And so it was seeking to reinstate his status, but certainly the board did not get into that issue. And its decision with the board said was that he did not maintain his status because he'd failed to complete his transfer through Bible college. And his status was automatically terminated on that date of February, 2018. So certainly even taking that, the date of the CVS notation as the date when status terminated, even if that's not correct as a factual matter, because the record is somewhat unclear on that point, but even taking that February date as the date that Mr. Wukusare fell out of status, the petition for review should still be denied for the reasons we have discussed regarding the proper interpretation of the statute. Let me ask you a question of exhaustion on the exhaustion front. In your view, did he exhaust the substantial evidence challenge that he's raising here? There's the interpretive question, but I mean, they're, they're related because I think he's saying there was a set substantial evidence because the district court, I mean, not district court, but the BIA applied the wrong law. But I mean, from, from a, from a, from a point of view of what issues in your view are properly before us, albeit the fact that they would be related, would it be those two? In other words, the interpretive issue and then the issue of whether there was substantial evidence to support the BIA's decision note, I don't see him making the argument that under the BIA's interpretation, there wasn't substantial evidence. He's saying under his interpretation, there isn't. So no matter what, are those two questions before us? So I'm not sure that I'm in entirely following your honor. All right. Well, let me back up there. There's the interpretive issue, the issue of whether you interpret this statute to require the hips, his failure to be attributed to causes by him. Okay. And what I understood him to argue is if you adopt that view of the law, since there would not be facts to support that in the record, then the BIA would not have had substantial evidence to support its decision. So those two issues would really be related. They're of a piece, but what I'm saying is, do you accept the premise that those two go together and no matter what we decide those two, they stand or fall in some ways together, but I'm just trying to see for purposes of what we need to decide. I think that's generally correct. Your honor. I suppose if this court were to agree with the government on the interpretive question, there could then potentially be a follow-up question of, you know, whether he was arguing that there's a lack of substantial evidence, even under the, you know, government's reading of the statute. And I'm not sure that he's. He hasn't in my view, I don't, and I'll ask him, but I don't see that in his brief. And so I think that's correct. Your honor. Okay. So I, so that point I think goes away. I'm just saying that under, but, but, but in terms of, you know, putting all this exhaustion stuff, you know, to aside for a second, at least those two related issues would be on the table. I think so. Certainly as to his reading of the. Okay. And regulations. And if I may just very briefly, your honors, my time remaining, Mr. Rukusare has also raised certain due process arguments in particular, pointing to the annotation in the CBIS database with regard to the automatic termination there. Even if this argument is properly presented to this court, Mr. Rukusare did receive the process that he was due. He had noticed an opportunity to be heard in this court has affirmed that in the context of removal proceedings, that what procedural process requires is a notice and a meaningful opportunity to be heard. Mr. Rukusare had that here. So even, you know, if that argument is probably presented, there was no procedural due process violation. And for the reasons we have stated in our briefs and today we've asked this court to deny Mr. Rukusare's petition for review. Thank you. Thank you, counsel. I'd like to respond to a few of the government points here. First and foremost, this case is about the interpretation of the removal statute. It's not about whether Mr. Rukusare was maintaining his status or whether he was in a full court success. Now to the point that there is no fault requirement in the statute. We acknowledge that there is a requirement in the statute, but we argue that by the plain language of the statute, it requires an additional act on the part of the non-citizen. And further, we also have evidence from other cases from this court where they do not have that explicit exception, but all, but still require action on the part of non-citizens. Certainly. The two, let me ask you this question. The death penalty related proportionality argument. On the exhaustion front. The death penalty related proportionality argument. There's an, is there anywhere in the briefing before the BIA where that argument appears? Yeah. I would point to the. I would point to the transcript of the integration proceedings. During this master calendar hearing. Starting on mine. On the administrative record. It's two 31. Mr. And he. He explained to the IJ on a human level, the IJ, the integration judge. Would agree with them that he could not have gone to jail in school at the same time. And therefore his status was violated. As he was in jail. She had no responsibility. So again, Mr. Mr. Sorry. Arguably telling the integration judge. This is unfair. To remove me for this would be, would be disproportionate. All right. I just, I didn't have a question, but I had. You're all through. I had a comment. No, please go ahead. I just, my comment is the. The advocacy in this case was excellent for both sides. And Mr. Chavarria. I'm not your instructor. There's Valdez is, but if it was me, I'd give you. An eight plus plus. No pressure. He's a top grader too. I absolutely plan to your honor. All right. All right. It was, it was excellent advocacy for both sides. Thank you. I agree. Terrific cases submitted. Thank you. Counsel.